Our last case of the morning is Ryan v. Country Mutual Insurance Co. 5-19-0206. The parties are ready. Thank you. Thank you. I'm going to begin with Stan and his wife. Excuse the court, counsel. First off, I want to thank the court for continuing the oral argument at our request. It was scheduled earlier and we had a conflict, so thank you for that. Your Honor, this case really turns on the interpretation of Illinois Statute 735 ILCS 2-2201 regarding the ordinary care that an insurance producer has to use under certain circumstances. And the key issue in the case is, did the court in Kropp say that any case brought under this statute has to be brought within two years when the policy was initially procured? I submit it to you that it's my opinion that Kropp didn't say that. And here's the reason why. If you take a look at 2-201, and it's only Section A, what it says is an insurance producer, and that's what's relevant for our analysis here today, shall exercise ordinary care and skill in renewing, procuring, binding, or placing the coverage requested by an insurer. Insurance producer includes agent and broker. Yes, sir. What the Illinois courts have determined used to be a distinction between a broker and an agent. A broker had a fiduciary duty, agents didn't. The courts have decided that this case got rid of some of the old common law distinctions and said any producer or a broker, so a captive agent or a broker have the same standard, and it's not a fiduciary duty. I wish it was. It would be a better standard for a blanket, but it's not. It's not just ordinary care. But what's important is what the statute says, and it says you've got to exercise ordinary care in renewing the policy. So if you have to exercise ordinary care in renewing the policy, and the policy was originally issued in this case in 1998 or 1999, and it was renewed every six months until 2016, if we narrowly construe what CROP says and says you can only do it within two years of the initial placement of the policy, well, then every renewal after 1991 would not be covered by this statute. You can't read that statute and hold that. You can't interpret CROP to completely ignore what the statute says the agent has a duty to do. And clearly the statute says the agent has to exercise ordinary care in renewing the policy. And you can go even further because it says renewing the policy by an insurer. What that means is they've already got an insured-insured relationship. So the statute clearly says an agent has a duty to use ordinary care when renewing a policy, and the facts of this case is that the policy at hand was not renewed until March of 2016. Fire occurred in April of 2016, and we filed the lawsuit in 2017, well within two years when the renewal policy was issued, well within the statute of limitation contained in the companion statute that says there's a two-year statute of limitation on the claims against insurance producers. I submit to you that the trial court, well, there wasn't any guidance at the time the trial court made their opinion, and there really isn't one case that kind of tangentially talked about CROP since it's been issued. I just think the trial court got it wrong. She just over-read CROP. It doesn't stand for the proposition that any case against an insurance producer for negligence has to be filed within two years. And the other distinction that's important for our case is that our case is not a case saying that you should have given us workers' comp coverage because we added it or we requested it and it wasn't there. This is not a case about was there or was there not coverage. There was clearly coverage for fire damage. Their dwelling was covered. The question in our case is whether or not there was enough coverage, the extent of coverage. And I submit to you that the facts of our case are so different from CROP that it would make no sense to use CROP with the language of CROP because here's the most glaring difference. In our case, when the policy was first issued, it's undisputed that the dwelling had a stated value of $300,000. The renewal policy had a stated value of $544,000. It was doubled almost for over the 17 years that the policy was in effect. For the more than 17 years the policy was in effect. So every time the policy was renewed, it had a new stated value. That stated value is what's then used to determine whether or not you get replacement costs or don't get replacement costs. That value is different every time. There is no way that Mr. and Mr. Ryan could have known by reading the policy in 1998 that they would not have enough coverage in 2016 when the fire occurred. That's just impossible. They couldn't have been able to make that determination because they would have had no idea what it was to replace their home in 2016. So you can't use the analysis in CROP. And that's all the analysis in CROP was is that if you know or should know by reading your policy that you have a claim when the policy is issued, then you have two years when the policy was issued. So you're saying it's the responsibility of the insurer to know how much the home is worth and then to adjust the policy rather than the insurer to know how much their own home is worth. I'm saying it's a combination, Your Honor, because the statute says that the agent has to use ordinary care in renewing the policy. And we had expert testimony that said in order to satisfy that ordinary care, the agent has to talk to the client and find out whether or not there's been any changes. Has the house increased in value? Has the house decreased in value? You have to have a conversation with the client. The undisputed fact in this case is the agent never talked to the client prior to renewing the policy. So the agent said I had no time to ever talk to the client prior to issuing any renewed policy about anything. So we know this. The statute requires something. Nothing is not something. The statute requires an extraordinary care when renewing a policy. The agent testimony went, I did nothing. That is by definition not doing something. And the statute requires something. I have an expert to say what he specifically required. But the court didn't get to that because the court said the claim was barred, time barred, by a case that came down after my case was filed and was time barred by a case that wasn't even mentioned in the original motions for summary judgment. So, again, the important factor is if we look at the statute that determines what the relevant, what the causes of action, what the duty is, it says there's a duty to use ordinary care when renewing a policy. And then when you look to the Kropp case, what Kropp held, what Kropp held was that, and this is in paragraph two of the number of paragraphs, we hold that when customers have the opportunity to read their insurance policy and can reasonably expect it to understand its terms, the cause of action for negligent failure to procure insurance accrues as soon as the customer receives the policy. First off, we don't have a claim for negligent procurement. We have a claim that he didn't renew it properly, that he didn't use ordinary care when renewing it. Secondly, we're not claiming that we didn't procure insurance. Our claim is that we didn't get the extent of insurance that we needed or that should have been given had ordinary care been used by the insurance agent. And lastly, I stated to you that there was no way in 1998 or 1999 when this policy was first issued that the Ryans could have had any way of determining what was going to be the stated amount of the policy because the policy, and here's the other thing that's very unusual. I know it's difficult for you all because you only got the record before you. The policy wasn't now being attached to any of the motions for summary judgment because that wasn't any of the original issue. But what the policy does say, and I can submit it supplementally if the court wants it, but what the policy does say is that if the value of the house, the cost to rebuild, the replacement cost, is within 120 percent of the stated value, then you get the replacement cost and the policy also had an insurance rider which said every renewal period the stated value of the house will increase by what we determine is the inflation factor. So there was no way for Mr. and Mrs. Ryan back in 1998 to be able to have any basis in the world to say in 2016 or any other year we know what the stated amount of the policy is going to be because the policy had a stated amount that changed every year by inflation. And you can clean that without even looking at the policy because what you do have as part of the record is the original declaration page, which was issued in 89 or 99, and that shows a $300,000 stated value. And then you have at least the September of the previous year, 2015 declaration page, which shows that it was at that point $9,536,000. For some reason, we didn't make it in the record, the March 2, 2016 policy declaration, which was the one in effect at the time of the fire, which shows that it was $544,000, but that was part of the statement of facts in the motion for summary judgment. Was there any reason for this substantial appreciation value of this particular piece of property? Was there a remodeling? Did they put a subdivision there that increased the value of it? I know the answer to that question, but it's not in the record before you because it wasn't asked at the depositions or anything like that. There were some remodelings. There were some additions that were added, and the other thing is it was built in a way that it was more expensive to rebuild now than when it was originally built. What about the side issue of the intelligence and, I guess, business sense of the insurer in this situation to recognize that it's foreign machinery needed to be better insured, and they needed to up the value on that? And why can't you extrapolate on that and say, well, if he was smart enough to know that the foreign machinery needed to be better insured, obviously my largest investment, my home, also needs that consideration? That's a good point, but I think you can read the opposite to that. I say foreign equipment, what normally happens is when farmers purchase equipment, they add equipment to the policy, they detract equipment on the policy, and I believe what happened was that there was a combine or a large equipment that was added, so it changed the schedule of insurance. I think with regards to the fact that the house was not ever specifically addressed leads more to the credence that my client thought he had replacement cost coverage, and what replacement cost coverage means, as you all know, it's just the cost to replace, that there is no cap. It's just whatever you spend to replace, and if you spend it, you get reimbursed for it. So I think by the fact that he did do that, it would lead you to believe that that was the case, and there are facts in the record that you do have that shows that when the house was originally constructed, that the client thought it had, my client thought it had value of about $300,000, and that was built sometime in 93, 94, 95, and that he initially had it insured for $300,000, so the 20% of that rule, if you did the way the policy worked, would be anywhere between $300,000 and $375,000 of coverage, and that would be consistent with what my client said would have cost us three years or four years before. About the scapegoats case, it seems to indicate that the only duty according to ordinary care is that the agent or insurance procurer provides the coverage that is requested by the insurer. Correct. So the number one thing he's got to find out is what's the insurer requesting, correct? Or if the insurer requests nothing, then they'll face a slower cost. I agree. I don't know how you can say that I gave you coverage as you requested, but I don't know what you requested. I mean, this is a very useful fact pattern. I don't think you're ever going to find a case where the agent comes in and admits, I never talked to him, but admit that I'm the agent on record who renewed your policy every six months. So yes, I think the scapegoat case is slightly more narrow because I think it talks about procuring insurance and not renewing. But either way, if you've got a duty to do what your client asks, then in order to fulfill that duty, you have to go to your client and ask, what do you want? You've got to ask them, what do you want? You can't just start insuring. I mean, say you wrote a policy for his nightclub in Brooklyn. We don't even have a nightclub in Brooklyn. I mean, you've got to find out where it is, what the property that guy has. And in this case, I think especially with regards to what I think it's a stretch to say that if an agent who has a long relationship with you, has taken your premiums for many years, has been out to your house and should know what your house looks like, should at some point in time say, we've been renewing this policy and it's been going up by inflation, has this house increased more than inflation? It's an easy question. I don't think it's that difficult and I don't think that's a burden imposed upon any insurance company. But we don't even need to get to that yet. Because the simple fact of this case is, the admitted fact is, he didn't talk to him at all about renewing the policy. And if we agree that he has a duty to do what the client asked him to do with regards to either renewing or procuring, then he's got to say, the client asked for this and I gave him this. And he doesn't say that. So I think that what we're asking to do simply is overturn the motion for summary judgment, send it back down to the trial court and let us be able to try the case on the issue. Yeah, look, if my client had a duty, which I think the law is he has a duty to read the policy, then the question is going to be whether or not they have some contributory negligence and have some responsibility for the loss. But that doesn't mean the fact that he may or may not have read the policy doesn't eliminate the statute that says that the agent has a duty to exercise ordinary care in renewing the policy. And you can look in the Kropp case. I'm sure you're familiar with it. I'm sure you all read it. It does talk about renewing. I even went back and listened to the 45 minutes of oral argument that's online. And the only time the word renewing is mentioned in there is once in which one of the judges makes the statement that the policy was renewed with exactly the same terms each time. We don't have that in this case. The most relevant issue in our case is the amount of coverage, not if there was coverage. And that amount changed every time the policy was issued. I will yield my time unless you all have more questions. I'd like to address your expert. Yeah, my expert, you have to understand that when I gave, when that affidavit was submitted, it was submitted in connection with the issues that were raised with the summary judge originally because it didn't have the issue with regards to the Kropp case. But what my expert did testify to was that he had reviewed the Illinois law. He had reviewed the policy and declarations that were issued in this case. And that based upon his experience, it was his opinion that a broker who was renewing a policy had a, had a duty to investigate and to have a conversation with the client about how the policy should be renewed. And secondly, my client, the expert testified that in his opinion, the way the declaration page and the way the policy was written, that it would be very difficult for a lay person to determine whether or not there was or was not forward placement cost coverage. And that was done not in an effort to try to gin up facts, to get around the exception that's contained in Kropp because Kropp wasn't even issued at the time. That wasn't even raised in our case. It wasn't a fact. It wasn't anything that was initially raised in the initial motion to the summary judge. He had experts testify on the standard of care in a lot of cases. And in this case, if you have, if it's a standard of care for an insurance agent, then my guy testified, he's been in the insurance business for 30 something years. I think he's qualified to give testimony regarding the standard of care. And I think he would be the person who would have some value of the court to decide that it was necessary to have some evidence, testimony as to whether or not the document is something that a lay person can read or not read based upon their experience in dealing with them. So I don't, I mean, the weird thing about it is the court never ruled on that motion to strike it anyway. It just kind of, I don't know what the court ruled. So, but I don't see, I mean, the affidavit is part of the record. The affidavit states what he relied upon. The affidavit has curriculum detail in it. And the affidavit has some specific opinions with regards to the duty and the understanding of the promise. You may have briefly mentioned this, but I maybe was not paying as much attention as I should have been. I found it kind of difficult in that there was no copy of the entire contract attached. Because sometimes, you know, you're not picking out certain provisions. You have to view the contract as a whole. And sometimes the understanding of what was the intent of the parties can be best gleaned when you have the whole document. And I did mention it. And what happened was because of the way the procedural posture of this case, the initial issue that was brought up for summary judgment was the argument that we talk about whether or not the agent, whether or not the agent could fulfill his duty by doing nothing. And counsel has taken the position that because my guy didn't ask for quote unquote specific coverage, therefore, that the agent didn't have anything in which to base it on. And therefore, you couldn't have a violation of the standard. And that we agree. That was all the initial fact basis of the summary judgment. When we went to argue the summary judgment, they then brought up this issue of the crop case that had recently been issued. And we didn't. It wasn't there. So we didn't know. So I didn't think it was proper to try to reopen the facts and then submit a copy of the policy. Because at that point in time, the policy before him, the policy, exact language of the policy wasn't relevant. I would submit to you that the failure to have that would be their burden. Because on summary judgment, they've got to show that not only that the case that the statute of limitation applies, but any exceptions don't apply as well. I think that's their burden on their summary judgment motion. But it really, it's more to do with the uniqueness of this case than anything else, Your Honor. And I apologize for that. Thank you. Thank you. Looks like we have Mr. Becker up first. Yes, Your Honor. My understanding is you'll have, what, one to 15 minutes. So you're giving yourself a little bit of a span. May it please the Court, my name is Alan Becker, and I represent Country Mutual's insurance agent, Jeff Kebab. Now the gist of the claim that the plaintiff has made, and it was alluded to once by counsel in his argument, is that the plaintiffs did not get, that the plaintiffs, what the plaintiffs wanted was insurance that would be uncount, that would have no limit to the amount of insurance, just whatever it was that they needed to replace the house. That's what they claim they wanted. Now it's not what they claim that they asked Mr. Peabody for, because they admitted, and counsel has argued over and over again, that there was no discussion between the plaintiffs and Jeff Peabody about what they wanted with respect to the house. So they never asked him for this uncount insurance. But they got a policy. What did they ask him for? What exactly did they ask him for? As far as the house? They never asked him for anything because they originally took out the policy with a different agent. And with that agent, they had this policy, and the policy states, in the policy, in very simple terms, that the maximum amount that the insurance company will pay is the amount that's stated in the declarations. It's a very simple language. We've quoted it in there. And that was in the first policy. And, of course, it is the same language consistently because we also showed that language in the last policy. So was it or was it not a replacement coverage policy? Yes, but what replacement coverage means is that's how you calculate the amount of the loss. And the replacement cost, and it's defined in the policy, means that you don't take depreciation. But a replacement cost policy still can have a cap. The cap being the amount that's stated in the declarations. And that's what the plaintiffs had. They had a policy from which they only had to look at two things. The language in the policy that says the most that we will pay for any one occurrence is the amount stated in the declarations. So they knew that they had a policy that was capped. What was that amount? What was that capped amount? Well, the original amount was this $300,000, but it increased every year by inflation. So in every year they could see what it was and they could see that it was a capped amount. Now, in the crop case on the statute of limitations, the Supreme Court expressly addressed the issue of whether it was a replacement policy. Because the policy that was in force at the time of the crop's loss was a replacement policy. Their original policy had been renewed a couple of times. And the Supreme Court held that you don't look at the most recent renewal policy. If you did that, there would never be a statute of limitations. You look at the policy that they first got from which they could understand what the terms were of the insurance. And in this case, and what the court said in crop is you look at the plain language of the policy. You don't need an expert about that. The plain language in the policy here is that there was a limit of liability, the amount stated in the declarations. And that's what they had going all the way back. And that's where the statute of limitations came in. Now, I'd like to address the issue of duty. Because counsel's argument that Mr. Peabody had a duty to make inquiries as to what the plaintiffs wanted is just made out of cold blood. Because it is totally contrary to what the Supreme Court held in the scapardous case. The scapardous case is not a case that's purely about original procurement. The scapardous case is about the interpretation of section 2201. And what the scapardous case held is that the duty of the insurance producer, the insurance agent like Jeff Peabody, does not arise until there is a specific request made by the insured. There's nothing in scapardous that suggests that the producer has to go and elicit a request. To the contrary, the Supreme Court in scapardous cited with approval the Carlini case. And that's the case in which a customer went to the producer and asked for coverage for his business. But he didn't ask for workers' coverage. And what the court held is that not only did that agent have no duty to get him workers' coverage, that agent had no duty even to ask him whether he wanted workers' coverage. In other words, it has to be the insured who initiates the request, who initiates the information as to what he wants. And only then, only then does the agent have the duty to exercise ordinary care to procure that. So this entire argument, based on an opinion of a so-called expert, this fellow from Alabama, has no standing in law in Illinois. And as we pointed out, this so-called expert is not permitted under Illinois law to express an opinion as to what the law is. The existence of a duty is for the court. And in scapardous, the Supreme Court explained exactly what the duty was under Section 2201. The other opinion that this fellow gave, the opinion that the plaintiffs could not have understood what their coverage was, is also totally improper. We cited, we cited several cases, including the Iwopaka case, for the proposition that in response to a motion for summary judgment, you can't create an issue of fact by putting in a conclusory affidavit from an expert. Now, in the reply brief, plaintiffs came back and cited some older cases, saying, oh, yes, you can. However, this issue was, has been put to rest again by the Illinois Supreme Court. And that's in the case of Roju, R-O-B-I-D-O-U-X, versus Oliphant, O-L-I-P-H-A-N-T, 201, Illinois 2nd, 324. And in that case, the court addressed the issue of whether you can create an issue of fact through a conclusory affidavit from an expert. And the court cited with approval the Iwopaka case, which we cited, and held that you cannot do that. The Supreme Court explained that if you can create an issue of fact to avoid summary judgment through a conclusory affidavit from an expert, you would simply be giving any party who could go out and find somebody to be an expert and give them a free pass to trial. That was the court. That's the language quoted by the Supreme Court at page 344 and said we cannot do that. Would you think that whether the contract is clear and the understanding of it more a question of law for the court rather than a question of fact to bring in an expert on it? I think that unless the court finds that language is ambiguous, yes, it is a question for the court. And that's exactly what the court did in the Crout case. The court looked at the language in the policy and said this is language that a reasonable person could understand as to what the coverage was. It was not considered to be a fact issue. The fact was what is the language that was in the policy? That's the fact. And the exception in the Crout case, the court said this is going to be a very narrow exception. Under the plaintiff's theory, the exception swallows up the entire rule. If it's simply that any time the plaintiff comes in and says, oh, I personally didn't understand it, that's not the standard set forth in Crout. So for both of these reasons, the statute of limitations and the fact that the duty under Section 2201 for Peabody was never triggered because, as plaintiffs admit, they never specifically asked him for anything, we ask that the decision below be affirmed. And I'd like to give the rest of my time to my co-detendent counsel. Thank you. My name is Gregory Burke. I'm a police and court counsel. I represent Country Mutual Insurance Company. I just want to highlight a couple of things that were pointed out by my co-defendant's counsel. And one is regarding the Crout case. The Crout case, contrary to what the plaintiff's counsel has asserted, is directly on point in this case. It talks about renewable policy. And in Crout, the Supreme Court held that the statute of limitations begins to occur when the policy is issued. In this case, the policy was issued in March of 1998. The statute of limitations would run two years later in 2000. Counsel? What about this argument that, look, in 1998, you know, counsel's clients, there's no way they could have predicted what the replacement cost would have been? As far as the ---- Four years later. Well, yeah, I understand that. As far as the cost of the house or the value of the house, it's stated in the declarations page that they're provided with every six months. And they have an opportunity to review the amounts of coverage and the limits of that coverage every six months when they're renewed. And they had an opportunity. So they saw the value, at least what they would be able to compensate it for if there was some type of an event that would incur policy. So with regard to the Crout case, they found it was found that it occurred when the policy was issued. In this case, it was issued in 1998. This is the AGRA Plus policy, this farm policy, and was renewed every six months thereafter. Mr. Wright testified in his own deposition, he had an opportunity to review the declarations page. He did have an opportunity to review the actual policy and had an opportunity to make changes to the policy if he so desired, to his coverage rather. And he did so when he asked for additional coverage on his farm implements periodically. Regardless of whether it was for additional coverage for new farm implement policies, if we extend the hypothetical, what if the Ryan's purchased a combine or tractor but neglected to tell their agent about it, would there be an affirmative duty on the part of the country or its agent to provide coverage on that additional farm implement? And the answer would be no, absolutely not. And this alternative argument that Planned Parenthood Council is making is that there is some affirmative duty on the part of the country or its agent to review the policy coverages in some periodic manner. And that's just not the case. The duty is on the insurer to determine and know what their coverage needs are, and presumably that's what Mr. Ryan did in this case, looking at his renewal declarations page every six months and finding, well, this has gone up with inflation and I think I've got enough coverage. There's no affirmative duty on the part of the insurance company or its agent to provide a review or determine whether or not that is adequate coverage. And we cited the case law regarding that. Regarding the affidavit of the expert, as my co-counsel has noted, Robitaille, it's clear that not only are the statements made by Mr. Stegall conclusions in his affidavit, but also there are no attached documents. He refers to documents. He refers to the declarations page and the policy language, apparently he reviewed those, but they're not attached to his affidavit, which is required under Rule 191. In Robitaille, they were clear. They said, where we would relax this attached papers requirement and construe it in conformity with a more lenient standard, we would be lowering the bar and allowing the avoidance of summary judgment whenever a party is able to produce an expert to support its position without supporting documentation. And, again, that would allow a free pass to trial whenever someone got an expert. We're asking the Court to affirm the summary judgment decision ruling at the trial court level. We have argued alternatively that we were entitled to summary judgment on other bases, including the plaintiff's allegations in their complaint not being supported by a sworn witness testimony. The plaintiff's alleged that Country Mutual, through its agent, failed to exercise ordinary skill in procuring insurance coverage they requested for their home. In sworn witness testimony, it's all refuted. Mr. Ryan testified he never made any requests to Mr. Peabody regarding his homeowner's insurance coverage. Ms. Ryan only discussed Medicare supplemental insurance and not homeowner's coverage. And Mr. Peabody, in his own deposition testimony, handed his affidavit, testified he never discussed homeowner's insurance coverage with the plaintiffs. A party cannot rely on allegations in his or her pleadings to create a genuine issue of material fact. When the basis for liability is refuted by sworn evidence, the defendant is entitled to summary judgment. We're entitled to summary judgment in this case. And thirdly, it's the duty that the plaintiff's trying to impose on the part of the insurance company or its agent to review the adequacy of the insurance coverage as to determine what would constitute adequate coverage. There is no affirmative duty on that part. And as the Court pointed out, in SCEPARAS, I'm mispronouncing it, but the duty is on the insured to request specific coverage. And that request triggers the duty on the insured's carrier or its agent to exercise coordinated care in renewing, procuring, binding, and placing coverage. That does not require the insurer to retain the best coverage possible. And I thank you for your time, unless there are any questions. Do you agree with what we can compute, or was there an attempt to compute, at what point the replacement cost of the home exceeded the amount of insurance plus inflation? I don't know that there was any calculation done on the part of the insured, which I assume, pursuant to case law and statute, that would be his burden, his duty, to determine that. Is that an onerous burden? I want to know the limits of my coverage on my home, and I can review the coverages as Mr. Ryan did in his case. He knew what coverages needed to be available for his farm implements, certainly. So he knew the value of those. Thank you. Thank you. Thank you. Do we have time to move up? Your Honor, it doesn't take a law degree to figure this case out, okay? Between the four of us, we've probably got 100 years of experience. But we know this is true. They renewed the policy. That renewal had to be done at the request of the insured. So if the insured requested it be renewed, then the law says they got its ordinary care when renewing it. There's no dispute the policy was renewed. There's no evidence that Country Mutual automatically renews a policy in perpetuity just because they're nice companies. They renewed it for a reason. And the reason is that the plaintiff had to ask somebody at Country Companies to renew the policy. And once the request for a renewed policy was made, he had a duty to insure that it was done in ordinary care. Not the plaintiff, the agent. That's what the case law says. And if you go back and look at Scafford, what all Scafford says was, or is, under Section 2-2201A, which is the one we started with, a duty to exercise ordinary care arises only after coverage is requested. Coverage was requested. How do we know? Because the policy was renewed. There is prior coverage on this policy. Now, what provision of the policy should Mr. and Mrs. Ryan have read to be able to know? We don't know. Why don't we know? Because that's not part of the record. They didn't include that in the motion. There was no basis for this court to decide that the policy language was ambiguous or ambiguous because the policy language wasn't before the court. Because it wasn't part of their motion for summary judgment. It arose afterwards. I didn't have a burden to prove that it wasn't there. Like I told you, I just submitted the affidavit not as a rebuttal to their argument. It was filed before it. You can go back and look at the docket. That's part of the record. I didn't make up facts to try to avoid summary judgment. I didn't make up facts trying to anticipate a case I didn't know the Supreme Court was going to rule, how the Supreme Court was going to rule. That was just the affidavit that was submitted. And if they had questions with regards to this foundation, they could have asked the court to do discovery. They didn't do that. They didn't bother to look at Mr. – they didn't bother to ask the court to have some discovery of the experts with regards to his opinion. The expert clearly said he based it upon the policy at issue. They're telling you they based it upon the policy at issue. They complained my expert didn't attach the policy. The policy's not in the record. It's not my fault. I didn't move for summary judgment. They did. There just isn't enough here for you all to affirm the summary judgment based upon this record, especially when we just use common sense. We know everybody in this room knows the policy was renewed in March of 2016. Why? Because when there was a loss in April of 2016, they made a payment. I think you can take judicial notice that insurance companies don't make payments on policies that aren't in effect. And this case doesn't present the issue of an unlimited statute of limitations because it would be two years from the date the policy was renewed. It's not anything other than that. If they would have waited until March of 2018 to file the lawsuit, they would be barred by the two-year statute of limitations. They didn't wait. The lawsuit was filed in 2017. So there's no danger of an unlimited statute of limitations. There's no danger of imposing a duty other than what the statute says. And the statute clearly says an agent has a duty when renewing insurance to exercise ordinary care. We know they renewed the insurance. We know they asked for fire coverage. The question is, did he exercise ordinary care in determining the amount of coverage, not whether or not there was or was not coverage, but determining the amount of coverage given the fact that they knew that the amount was based upon the cost to construct some 20-plus years earlier and had only been increased by inflation and not taken into account any other factors that the insurer may or may not have known about. And for those reasons altogether, I don't see how there's any way that this court on the current state of Illinois can uphold this summary judgment. And thank you for listening. I appreciate your time. Thank you. The court will take into consideration the matter and issue its ruling in due course. I'm going to stand adjourned until probably 1.30.